❒ Original ❒ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Records and information associated with the cellular device assigned call number 414-807-3988 ("TARGET CELL PHONE 3"), further described in Attachment A

Case No. 26-855M(NJ)

Matter No 2025R00353

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ______ District of ______
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before 2/12/2026 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Nancy Joseph.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 11/24/2026.

Date and time issued: 1/29/2026 @ 4:18 p.m.

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

<u>**ATTACHMENT A**</u>

**Property to Be Searched**

1. Records and information associated with the cellular device assigned call number **414-807-3988** (referred to herein and in Attachment B as "**Target Cell Phone 3**"), with listed subscriber "No Name," and user Michael A. TERRY, that is in the custody or control of AT&T, (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 5400 Legacy Drive, Plano, Texas, 75024.

2. **Target Cell Phone 3**.

## ATTACHMENT B

### Particular Things to be Seized

### I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with **Target Cell Phone 3** for the time period September 1, 2025, to the present:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Target Cell Phone 3** for the time period September 1, 2025, to the present including:

a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as Network Event Location Operating System Information, or NELOS data.

b. Information associated with each communication to and from **Target Cell Phone 3** for a period of **30** days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which **Target Cell Phone 3** will connect at the beginning and end of each communication, as well as Network Event Location Operating System Information, or NELOS data.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with **Target Cell Phone 3**.

c. Information about the location of **Target Cell Phone 3** for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, NELOS data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively

and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of **Target Cell Phone 3** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, involving Michael TERRY.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Records and information associated with the cellular device assigned call number 414-807-3988 ("TARGET CELL PHONE 3"), further described in Attachment A

Case No. 26-855M(NJ)

Matter No 2025R00353

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ________________ District of ________________________, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 | Distribution of a Controlled Substance, Possession with the Intent to Distribute a Controlled Substance, Use of a Communication Facility in Furtherance of a Drug Trafficking Offense, and Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

See attached Affidavit

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 11/24/2026 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

ROBERT GREGORY (Affiliate) Digitally signed by ROBERT GREGORY (Affiliate) Date: 2026.01.27 16:47:21 -06'00'

*Applicant's signature*

Robert Gregory, DEA TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 1/29/2026

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Robert Gregory, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for the information about the location of the cellular telephone assigned call number **414-807-3988** (“**Target Cell Phone 3**”), whose service provider is AT&T (“Service Provider”), a wireless telephone service provider headquartered at 5400 Legacy Drive, Plano, Texas, 75024. **Target Cell Phone 3** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B. **414-807-3988** (“**Target Cell Phone 3**”) is believed to be used by Michael A. TERRY (XX/XX/1989) and the listed subscriber is “No Name.”

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a “pen register” and/or “trap and trace device,” *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am Police Officer with the Milwaukee Police Department (WI) and a Federally Deputized Task Force Officer with Drug Enforcement Administration (DEA) assigned to DEA Group 68. I am also assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) – Interdiction Initiative as a drug detection K9 handler and partnered with K9 “Titus.” I have been employed as a full-time law enforcement officer for over ten (10) years.

4. As Police Officer and Task Force Officer, I have participated in the investigation of gang and narcotics related offenses, resulting in the seizure of illegal drugs, weapons, United States currency, and other evidence of criminal activity. As an investigator, I have interviewed many individuals involved in drug trafficking and gang activity, and have obtained information from them about the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the drug traffickers, gang members, and abusers of controlled substances. I have participated in all aspects of drug and gang investigations, including physical surveillance, execution of search warrants, court-ordered wiretaps, analysis of phone and financial records, and the arrests of drug traffickers. I have also been the affiant and participated in the preparation and execution of drug and gang-related search warrants. Additionally, I have spoken with other experienced drug investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers and gang members to manufacture, smuggle, safeguard, and distribute narcotics and firearms, and to collect and launder trafficking-derived proceeds. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of cellular devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their locations.

5. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws including Title 21, United States Code, Sections 841(a)(1) and 846 (possession with intent to distribute a controlled substance and

conspiracy to possess with intent to distribute a controlled substance), and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps.

6. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

7. As part of my duties as a DEA TFO, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the federal controlled substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, 846, and federal firearms offenses, including violations of Title 18, United States Code, Sections 922(g), 924(a), and 924(c). During the course of my experience, I have and continue to be involved in investigations of criminal offenses and have assisted with search warrants for items related to gang investigations, organized crime, violent crime, firearms offenses, drug trafficking, thefts, and counterfeit crimes, including cellular telephones and other electronic telecommunication devices.

8. Based on my training, experience and participation in drug trafficking investigations and associated financial investigation involving controlled substances, I am familiar with the methods used by drug traffickers and drug organizations to manufacture, smuggle, safeguard, and distribute controlled substances, and to collect and launder trafficking-derived proceeds. Further, I am familiar with computers and cellular telephones, and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions. Based on my training and experience, I know that drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the

form of voicemail, email, text messages, and video and audio clips. I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices. I also know that cellular telephones can provide location information relevant to the offenses of investigation.

9. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

11. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (use of a communication facility in furtherance of drug trafficking) have been committed, are being committed, and/or will be committed by Michael A. TERRY (XX/XX/1989). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

12. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court

of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

13. As detailed below, in late-2025, case agents commenced an investigation into a cocaine and methamphetamine trafficker who was active in the Milwaukee area. This subject, Miguel GONZALEZ, was later arrested and his cellular phones were searched pursuant to a federal search warrant. By reviewing GONZALEZ's stored text messages, case agents identified one of GONZALEZ's drug customers as the user of **414-807-3988** ("**Target Cell Phone 3**") (believed to be Michael TERRY ). Based on my training and experience, and review of said text messages, I believe that the user of **Target Cell Phone 3** is a large-scale cocaine trafficker (kilogram quantities) and I believe that tracking the location of **Target Cell Phone 3** will aid in confirming that TERRY is the user of **Target Cell Phone 3** and will lead to locations where drugs are stored and alternative sources of supply now that GONZALEZ is in custody. Below, I first detail the investigation into GONZALEZ and then provide relevant examples of GONZALEZ's messages with **Target Cell Phone 3.**

## INVESTIGATION INTO GONZALEZ & THE SEIZURE OF GONZALEZ'S CELL PHONES

### Seized Parcels

14. On Tuesday, September 30, 2025, Wisconsin State Patrol Trooper Gareth Sedgebeer-Williams and Drug Enforcement Administration (DEA) Task Force Officer (TFO) Robert Gregory responded to a private parcel carrier for random parcel screening. Case agents located two different parcels that were addressed to Thomas Baker of 3021 West Auer Avenue, Milwaukee, Wisconsin. The parcels were sent from Glenair INC of 1211 Air Way, Glendale, California, 91201. Case agents were unable to find a "Thomas Baker" residing at 3021 West Auer Avenue

and believed it to be a fake alias.

15. Trooper Sedgebeer-Williams deployed his trained controlled substance detection K9 (Smoky) on the parcels and Smoky gave a final indication to the odor of controlled substances coming from the parcels. Trooper Sedgebeer-Williams composed a State of Wisconsin search warrant to search the contents of the parcels.

16. Upon the warrants being granted, case agents located approximately 20 pounds of crystal methamphetamine in each parcel (40 pounds of crystal methamphetamine total).

17. Also on September 30, 2025, law enforcement executed a controlled delivery of the seized parcels. The crystal methamphetamine was removed from the parcels and they were filled with "sham," (a substance that is not a controlled substance). An undercover Milwaukee Police Officer delivered both parcels to 3021 West Auer Avenue and placed them on the ground in front of the door. Officers observed a male, later identified as Brandin S. FOUNTAINE (DOB XX/XX/1986), walk to 3021 West Auer Avenue. FOUNTAINE observed both parcels and he ran back to 3002 West Burleigh Street. FOUNTAINE then drove out of 3002 West Burleigh Street in a black pick up truck. FOUNTAINE drove directly to 3021 West Auer Avenue and placed both parcels in the bed of his pick up truck. After FOUNTAINE obtained the parcels, law enforcement conducted a traffic stop of the vehicle and FOUNTAINE was detained.

18. A *Mirandized* Interview was conducted of FOUNTAINE. FOUNTAINE stated that he rents a space within 3021 West Burleigh Street to fix automobiles, but also conducts maintenance work at 3002 West Burleigh Street and 3021 West Auer Avenue. FOUNTAINE stated he was walking his dog when he observed the two parcels at 3021 West Auer Avenue. FOUNTAINE later obtained the parcels and was going to bring them back to 3002 West Burleigh Street and put them in a common area where all delivered parcels go to. FOUNTAINE denied knowing what was inside of the parcels. FOUNTAINE gave officers consent to download and

inspect the contents of his cell phone. FOUNTAINE was later released.

19. Case agents reviewed the data on FOUNTAINE's cell phone. On September 30, 2025, at approximately 10:39AM, FOUNTAINE was texting with "Babezzz" (608-421-4960). FOUNTAINE stated, "The package still isn't here. We are down the block waiting for it me and the Mexican.". With this message being on the same day as the controlled delivery, case agents believe that FOUNTAINE lied to law enforcement and was in fact involved in obtaining the parcels that previously contained crystal methamphetamine.

20. Case agents also found a text message string with Target Cell Phone 1 within FOUNTAINE's cell phone. As it will be explained later in this affidavit, case agents found Target Cell Phone 1 to be utilized by Miguel A. GOZNALEZ (DOB XX/XX/1995). The contact name was "Twitch" in FOUNTAINE's cell phone. Case agents conducted a check of CashApp for Target Cell Phone 1 and found the CashApp account to be: "Miguel Gonzalez $74sendittt". On June 19, 2025, at approximately 11:46PM, Target Cell Phone 1 (believed to be GONZALEZ) texted FOUNTAINE, "Tell primo I need him active by 8am" and "Get a little rest" and "Its important". Case agents subpoenaed records from the private parcel company from which the two methamphetamine-laden parcels came. Case agents requested a comprehensive list of all parcels that were sent by Glen Air INC from January 1, 2025 to October 7, 2025. Case agents searched for all parcels that were delivered on June 20, 2025. Case agents found that a parcel was delivered to 3100 West Concordia Avenue, Milwaukee, Wisconsin, 53216. 3100 West Concordia Avenue is one block north and one block west of 3021 West Auer Avenue.

21. Based on the text message sent by Target Cell Phone 1 (believed to be GONZALEZ) to FOUNTAINE, along with the delivery of the parcel, case agents believe that GONZALEZ was telling FOUNTAINE that a parcel was being delivered and that he (FOUNTAINE) and "Primo" would be needed to pick up the parcel.

## Confidential Source Information

### Confidential Source 1

22. In October of 2025, case agents were made aware of a confidential source (CS 1) that had information related to this investigation. On Tuesday, October 30, 2025, case agents met with CS 1. CS 1 stated that in July or August of 2023, CS 1 met Anthony M. MITCHEM (white male 01/23/1980) while incarcerated. Case agents showed CS 1 a photograph of MITCHEM and CS 1 positively identified MITCHEM. While in custody, CS 1 and MITCHEM spoke about crystal methamphetamine trafficking. In January of 2024, after being released from custody, MITCHEM called CS 1 about CS 1 obtaining crystal methamphetamine from MITCHEM. That same day, CS 1 drove to Milwaukee and met with MITCHEM at a gas station. CS 1 bought 1 pound of crystal methamphetamine from MITCHEM for $3,000. CS 1 estimated that he purchased anywhere between 3 to 5 pounds of crystal methamphetamine from MITCHEM.

23. While CS 1 was dealing with MITCHEM, MITCHEM introduced CS 1 to MITCHEM's uncle. CS 1 did not know this individual's real name. From case agents' knowledge of this investigation, case agents believed the uncle to be a subject herein referred to as Confidential Source 2 (CS 2). Case agents showed CS 1 a photograph of CS 2 and CS 1 identified CS 2 as CS 1's crystal methamphetamine supplier.

24. According to CS 1: In May or June of 2024, CS 1 was released from a drug treatment program and CS 1 received a phone call from CS 2. They spoke about the sales of crystal methamphetamine and CS 1 agreed to begin buying crystal methamphetamine from CS 2. Shortly thereafter, CS 1 would travel to Milwaukee once a week to purchase crystal methamphetamine from CS 2.

25. According to CS 1: If CS 1 arrived in Milwaukee during the day, CS 1 would meet CS 2 at a factory building CS 2 managed. From case agents' knowledge of this investigation, case

agents knew that CS 2 was associated with 3002 West Burleigh Street. Case agents showed CS 1 a Google Maps photograph of 3002 West Burleigh Street and CS 1 positively identified this as the building where CS 1 would meet CS 2 to purchase the crystal methamphetamine. 3002 West Burleigh Street is the building in which Brandin FOUNTAINE attempted to bring two parcels that previously contained crystal methamphetamine before being detained by law enforcement.

26. CS 1 stated that CS 1 would arrive at the location and CS 2 would open the gate for CS 1 to drive in. CS 1 would drive to a parked camper or RV and stay in the vehicle. CS 2 would go inside of the camper or RV to obtain the crystal methamphetamine. The transaction would occur and CS 1 would immediately leave.

27. Through their criminal relationship, CS 1 estimated that CS 1 purchased one pound of crystal methamphetamine from CS 2 on approximately 20 different occasions. CS 1 purchased five pound quantities on approximately 4 different occasions. In total, CS 1 stated that CS 1 purchased 40 to 50 pounds of crystal methamphetamine from CS 2. CS 1 further stated that the crystal methamphetamine that CS 1 was arrested with was purchased from CS 2.

28. Beginning in October of 2025, CS 1 made statements against CS 1's penal interest. CS 1 has the following criminal convictions: burglary, operating a vehicle without owner's consent, attempt disarming of a police officer, felony bail jumping, possession with the intent to deliver marijuana, felon in possession of a firearm, possession of controlled substances, and possession with the intent to deliver amphetamine. CS 1 is currently in custody after being charged with controlled substance trafficking in the Eastern District of Wisconsin. CS 1 has not been promised consideration for providing law enforcement with information on on-going criminal activity. Thus far, the information provided by CS 1 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 1's information has been corroborated by

seizures of physical evidence. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 1 is credible and CS 1's information reliable.

**Confidential Source 2**

29. Case agents found that CS 2 was currently in custody. Case agents met with CS 2 on two different who provided case agents with information related to this investigation.

30. The following information was derived from an in person debrief of CS 2 in November of 2025. CS 2 stated that in March or April of 2025, CS 2 rented out a portion of a warehouse building located on North 30th Street and West Burleigh Street. TFO Gregory showed CS 2 a photograph of 3002 West Burleigh Street and CS 2 positively identified this as the building in which CS 2 rented a space. 3002 West Burleigh Street is the warehouse building in which FOUNTAINE was bringing the seized crystal methamphetamine parcels to before he was stopped by law enforcement on September 30, 2025. Case agents showed CS 2 a photograph of FOUNTAINE and CS 2 positively identified FOUNTAINE. CS 2 stated that the building is owned by Frank MITCHEM. CS 2 has known Frank MITCHEM CS 2's whole life and considers Frank MITCHEM as a nephew. CS 2's space inside the building was the rear West corner and CS 2 paid Frank Mitchem $1,500 per month. CS 2 was able to give officers the name of other individuals that rented space within the building: "Cuba", individuals from Venezuela, "Brett", "Marco", and "Miguel".

31. CS 2 also knew "Miguel" as "Bobby." CS 2 stated that "Miguel" was CS 2's crystal methamphetamine supplier. TFO Gregory showed CS 2 a Wisconsin Department of Transportation (WI DOT) photograph of GONZALEZ and CS 2 positively identified GONZALEZ as CS 2's crystal methamphetamine supplier. CS 2 stated that GONZALEZ's personal phone number started with "807." Case agents knows that GONZALEZ's phone number is 414-807-0753 (Target Cell Phone 1). According to CS 2, GONZALEZ would use other phones that he utilized for

controlled substance trafficking and would change phones/phone numbers every month. CS 2 stated that GONZALEZ lives with his child's mother near the area of South 23rd Street and West National Avenue. Case agents conducted a WI DOT check of GONZALEZ and found his registered address to be 738 South 23rd Street. This registered address corroborates CS 2's information. Through law enforcement databases, case agents found that GONZALEZ is romantically involved with Anatalia L. RODRIGUEZ (DOB XX/XX/1989). RODRIGUEZ's WI DOT registered address is also 738 South 23rd Street.

32. CS 2 had known GONZALEZ for approximately four years before GONZALEZ had moved into 3002 West Burleigh Street. Shortly after moving into the warehouse, GONZALEZ approached CS 2 and began to ask about CS 2's open federal case. CS 2 assured GONZALEZ that CS 2 was not cooperating with law enforcement and GONZALEZ inquired with CS 2 if CS 2 knew of individuals that wished to purchase crystal methamphetamine. CS 2 in fact did have associates of Asian descent that wished to purchase crystal methamphetamine. CS 2 knew these individuals as "Asian Boy" and "Fire Boy." CS 2 believed that "Asian Boy" and "Fire Boy" were crystal methamphetamine users and street level traffickers that sold the crystal methamphetamine in a "tent city" near North 32nd Street and West Cherry Street.

33. CS 2 then began to fill orders for these individuals through GONZALEZ. For about a month, CS 2 would obtain an ounce of crystal methamphetamine from GONZALEZ and then sell the crystal methamphetamine to the buyers. CS 2 would sell the crystal methamphetamine for $200 and would make $100 of the transaction. Every time that CS 2 would order the crystal methamphetamine from GONZALEZ, GONZALEZ would leave 3002 West Burleigh Street and come back with the crystal methamphetamine shortly thereafter. This made CS 2 believe that GONZALEZ has a stash location nearby. CS 2 further stated that sometimes FOUNTAINE would go and get the crystal methamphetamine and bring it to 3002 West Burleigh Street.

34. The transactions amounts increased from ounces, to multiple ounces, to then even half pounds and full pounds of crystal methamphetamine. CS 2 would sell a half pound of crystal methamphetamine for $1,250 to $1,300 and a full pound for $2,000 to $2,500. CS 2 estimated that CS 2 sold "Asian Boy" and "Fire Boy" 10 to 20 pounds of crystal methamphetamine. All of this crystal methamphetamine was obtained by CS 2 from GONZALEZ.

35. CS 2 was arrested operating a vehicle while intoxicated prior to the seizure of the two methamphetamine-laden parcels discussed above. CS 2 stated that last crystal methamphetamine transaction CS 2 made with "Asian Boy" and "Fire Boy" was one week before CS 2 was arrested and CS 2 sold them one pound of crystal methamphetamine that CS 2 obtained from GONZALEZ.

36. CS 2 stated that CS 2's nephew, Anthony MITCHEM, introduced CS 2 to another crystal methamphetamine trafficker, CS 1. Case agents showed CS 2 a WI DOT photograph of Anthony MITCHEM and CS 2 positively identified Anthony MITCHEM as CS 2's nephew. Through case agents' knowledge of this investigation, case agents know this to be CS 1. Case agents showed CS 2 a WI DOT photograph of CS 1 and CS 2 positively identified the individual. CS 2 knew that CS 1 was from the Fox Valley area. CS 1 would travel to the Milwaukee area and purchase crystal methamphetamine from CS 2. CS 2 would meet CS 1 in a number of different areas: Potawatomi, 3002 West Burleigh Street, or other areas in Milwaukee. CS 2 further stated that CS 2 knew CS 1 was arrested by police while in possession of crystal methamphetamine. CS 2 stated that days prior to CS 1 being arrested, CS 2 sold CS 1 two pounds of crystal methamphetamine that CS 2 received from GONZALEZ. CS 2 estimated that CS 2 sold crystal methamphetamine to CS 1 on 10 to 15 occasions. All of the crystal methamphetamine sold by CS 2 to CS 1 was supplied by GONZALEZ.

37. CS 2 was then asked how GONZALEZ was obtaining the crystal methamphetamine. CS 2 had first-hand knowledge that GONZALEZ would receive the crystal methamphetamine through the mail from California. CS 2 did not know the company utilized to send the parcels. GONZALEZ would use different addresses to have the parcels sent to. GONZALEZ would commonly have more than one parcel sent at a time. The total sum of the parcels ranged from 20 to 50 pounds. CS 2 estimated that GONZALEZ would receive a shipment once a month or every six weeks. CS 2 stated that if there were two parcels coming to Milwaukee, GONZALEZ would go to one location while FOUNTAINE would go to the other.

38. CS 2 recalled a parcel delivery in the summertime of 2025. CS 2 was present for the delivery and believed it to be in the area of North 47th Street or North 49th Street by West Hampton Avenue. CS 2 remembers the house was by a McDonalds by West Hampton Avenue. Case agents reviewed a map of the area and found a McDonalds on the South West corner of North 49th Street and West Hampton Avenue. CS 2 knows that GONZALEZ has a family member in the area and GONZALEZ picked an abandoned house in the area to have the parcel sent to. GONZALEZ obtained the package after it was delivered and opened it in front of CS 2. CS 2 stated that the parcel was filled with packing peanuts and there were numerous saran wrapped bundles that each contained one pound of crystal methamphetamine. CS 2 estimated there was 10 pounds of crystal methamphetamine in the parcel. This packaging style is the same in which case agents encountered in the two seized parcels from September 30, 2025.

39. CS 2 stated that GONZALEZ would take frequent trips to California in order to pay his crystal methamphetamine supplier. CS 2 further stated that the supplier would commonly come to Milwaukee and GONZALEZ would have to entertain the individual. When the supplier would come to Milwaukee, GONZALEZ would be frantically collecting money from customers in order to pay the supplier.

40. Investigators conducted a review of Wisconsin Department of Corrections recorded jail call system, ICSOULTIONS, for Target Cell Phone 1. Since CS 2 has been in custody, CS 2 has been in contact with GONZALEZ on Target Cell Phone 1 on seven different occasions between 10/17/2025 and 11/11/2025.

41. Beginning in 2024, CS 2 made statements against CS 2's penal interest's concerning CS 2's federal drug indictment. CS 2 was released from custody and not revoked on CS 2's state supervision despite the federal charges to allow CS 2 to cooperate with law enforcement. CS 2 provided cooperation to federal agents until CS 2 was arrested for operating under the influence and held in custody. CS 2's cooperation included at least one controlled buy of controlled substances and CS 2 providing information concerning drug traffickers in the Milwaukee area. CS 2's information regarding these drug traffickers was credible and, in some cases, independently corroborated by law enforcement. Further, CS 2 provided location information on a wanted subject that led to that person's arrest. However, during that time, and against CS 2's cooperation agreement, CS 2 became involved in selling methamphetamine to CS 1 and others as recounted above. When confronted with this by case agents following CS 2's arrest, CS 2 admitted to CS 2's conduct and made further statements against CS 2's penal interest concerning CS 2's trafficking of methamphetamine while CS 2 was actively cooperating with law enforcement. Case agents believe that when CS 2 was confronted with case agents' knowledge about CS 2's methamphetamine trafficking CS 2 provided a truthful statement regarding CS 2's involvement in methamphetamine sales. It is possible, however, that CS 2 was involved in *other* unlawful or deceptive conduct while CS 2 was cooperating with law enforcement, and that law enforcement has not yet learned of this additional unlawful or deceptive conduct. On balance, because case agents have corroborated a significant amount of information provided by CS 2 concerning GONZALEZ and CS 2's connection to GONZALEZ, they believe CS 2's information

concerning GONZALEZ is accurate and reliable. CS 2 has the following criminal convictions: recklessly endangering safety, burglary, felony bail jumping, escape, possession with the intent to deliver cocaine, and felon in possession of a firearm. CS 2 is currently in custody after being charged with controlled substance trafficking in the Eastern District of Wisconsin and state charges of OWI (1st w/ Passenger < 16 Yrs Old), Operating w/ PAC-Passenger < 16 Yrs, PAC>=0.08, <0.15 (1st), and Neglecting a Child (No Harm and Child < 6 Yrs or Disability). CS 2 has not been promised consideration for providing law enforcement with information on on-going criminal activity. Thus far, the information provided by CS 2 concerning the investigation into GONZALEZ has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 2 is credible and CS 2's information reliable.

42. Case agents went to the area where CS 2 reported the "tent city" and located several caravans/RVs parked in an area consistent with CS 2's information.

43. Separately, the Drug Enforcement Administration (DEA) conducted a controlled buy operation using CS 3 in the same general area near 32nd Street in Milwaukee, Wisconsin. In sum, within the last 30 days, DEA conducted two controlled buys of crystal methamphetamine from a male of Asian descent (Kue LEE (DOB XX/XX/1981)). The methamphetamine purchased during each operation is believed to be supplied to LEE by GONZALEZ.

44. For several reasons, case agents believe CS 3's information is reliable and that CS 3 is credible. Substantial parts of CS 3's information has been independently corroborated and verified by law enforcement. CS 3 has made direct observations, which were further corroborated and verified by law enforcement. CS 3's information has been consistent with information obtained from telephone toll records, social media records, public databases, and surveillance. CS

3 has also provided information to the Brown County Drug Task Force and the Marinette County Sheriff's Department, which has been verified by law enforcement. CS 3 has prior convictions for theft, possession of controlled substances, battery, and manufacture or deliver controlled substances. CS 3 is cooperating for consideration on open cases for drug-related offenses. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 3 is credible and CS 3's information reliable.

45. On November 19, 2025, Waukesha County Drug Task Force (WCDTF) confidential source (herein CS 3) purchased approximately 472.9 gross grams of suspected methamphetamine, approximately 91.2 gross grams of suspected Fentanyl, and approximately 55.4 gross grams of suspected fentanyl from Kue LEE. As detailed below, I believe that the methamphetamine provided to CS 3 by LEE was supplied to LEE by GONZALEZ.

46. On November 19, 2025, TFO Kopatich and SA Kazamias met with CS 3. TFO Kopatich searched CS 3 and CS 3's vehicle for money, contraband, and controlled substances, with negative results. After the search, TFO Kopatich provided CS 3 with a quantity of Officially Advanced Funds (OAF). Additionally, CS 3 was provided with a live feed audio/video recording device and recording a device was placed in CS 3's vehicle. CS 3 was contacted by LEE and informed that LEE was staying at the Holiday Inn Express. CS 3 was kept under constant surveillance and drove towards the Holiday Inn Express, located at 525 N. Jefferson Street, Milwaukee, Wisconsin. CS 3 parked CS 3's near the Holiday Inn Express and subsequently entered room number 202. LEE and an unidentified female (hereafter referred to as UFM1) were in room 202. While in room 202, CS 3 provided LEE with the buy money for the purchase of the controlled substances as witnessed by TFO Kopatich via live video feed.

47. CS 3, LEE, and UFM1 exited the hotel room, and subsequently entered CS 3's vehicle and departed the area. It should be noted that CS 3 was under constant surveillance as CS

3, LEE, and UFM1 travelled to a residence located at 320 N. 32nd Street, Milwaukee, Wisconsin. CS 3, LEE, and UFM1, parked behind 320 N. 32nd Street, and exited the vehicle. Subsequently, they proceeded to enter a gated area where there was a shed and camper. CS 3 entered the camper. Shortly thereafter, LEE went into a shed near the camper. At one point, CS 3 exited the camper in order to open the gate for three middle-aged Asian males who met with LEE in the shed while CS 3 went back into the camper. A short time later, the three Asian males left after which LEE provided the suspected purple fentanyl to CS 3. During a post operational debrief with CS 3, CS 3 stated that the three Asian males were the ones who delivered the purple fentanyl to LEE. CS 3 further reported that CS 3 has seen the same males deliver the fentanyl to LEE in the past prior to LEE providing the fentanyl to CS 3.While inside the camper, CS 3 waited for the delivery of controlled substances with multiple unidentified individuals, believed to have been customers.

48. TFO Loftus observed a gray Honda Odyssey bearing WI Registration BCD5755 (subject vehicle) arrive at 21st and St. Paul in Milwaukee, Wisconsin. Shortly thereafter, TFO Loftus observed LEE enter the Odyssey (subject vehicle) and depart the area. A Wisconsin Department of Transportation check of the Odyssey (subject vehicle) lists the vehicle to a Rehab Better Home LLC, with a listed address of 155 E. Johnson Street, Fond Du Lac, WI, 54935. Shortly after meeting with the occupant(s) in the Odyssey (subject vehicle), LEE returned to the camper. CS 3 exited the camper, entered CS 3's vehicle, and departed the area. CS 3 was kept under constant surveillance as CS 3 departed the residence and met with case agents at a predetermined meet location. While at the predetermined meet location, TFO Kopatich retrieved four quantities of suspected controlled substances from CS 3. TFO Kopatich searched CS 3 and CS 3's vehicle for money, contraband, and controlled substances, with negative results.

49. Case agents conducted a post-operational debrief with CS 3. During the debrief, CS 3 stated that LEE met with the methamphetamine source of supply in a van (which, in context,

I believe to be the subject vehicle) in the area of N. 31st Street and St. Paul Avenue, the same location where TFO Loftus observed LEE entering the Honda Odyssey (subject vehicle). CS 3 stated that CS 3 believed the methamphetamine source of supply to be a Hispanic male. CS 3 stated that LEE returned to the camper with a small box containing two individually wrapped pounds of methamphetamine. According to CS 3, LEE removed one of the pounds to be divided amongst the waiting customers while LEE gave CS 3 the box containing the other pound. CS 3 also stated that LEE had provided CS 3 with the purple fentanyl as well as a small bag of white fentanyl. The CS also stated that an unidentified subject gave CS 3 a quantity of suspected marijuana. CS 3 stated that prior to leaving, LEE told CS 3 that CS 3 owed LEE $1,400 to be paid at a later time.

50. Case agents reviewed Wisconsin Department of Financial Institutions (WIDFI) records for "Rehab Better Home LLC" and learned that the Registered Agent is Miguel A. GONZALEZ and the principal office is listed as 738 S. 23rd Street, Milwaukee, Wisconsin 53204. As detailed above, case agents conducted a WI DOT check of GONZALEZ and found his registered address to be 738 South 23rd Street. Based on my training and experience, the information provided by CS 1, CS 2, and CS 3, the observations made during the controlled buy with CS 3, and the WIDOT and WIDFI records, I believe that GONZALEZ (or someone operating on GONZALEZ's behalf) delivered two pounds of methamphetamine to LEE inside the Odyssey (subject vehicle).

51. On December 9, 2025, WCDTF CS 3 purchased approximately 260.2 gross grams of suspected methamphetamine and approximately 110.6 gross grams of suspected Fentanyl from Kue LEE. As detailed below, I believe that the methamphetamine provided to CS 3 by LEE was supplied to LEE by GONZALEZ.

52. On December 9, 2025, at approximately 11:40 a.m., SA Kazamias, TFO Kopatich, TFO Loberg, TFO Kropp, and TFO Ronsman (Brown County Task Force) met with CS 3 at the Milwaukee District Office (MDO). At approximately the same time, TFO Loberg searched CS 3 and CS 3's vehicle for money, contraband, and controlled substances, with negative results. Shortly thereafter, TFO Kropp provided CS 3 with $2,350.00 USC in Officially Advanced Funds (OAF). It should be noted that CS 3 was also provided with $1,250.00 USC in Brown County Task Force Funds by TFO Ronsman. In total, CS 3 was provided with $3,600.00 USC in buy funds. Additionally, CS 3 was provided with a live feed audio/video recording device.

53. At approximately 11:55 a.m., CS 3, under constant surveillance, departed the predetermined meet location and drove towards 320 N. 32nd Street, Milwaukee, Wisconsin. Shortly thereafter, at approximately 12:03 p.m., CS 3 arrived at the 320 N. 32nd Street address, exited his/her vehicle, and entered the camper located near the rear of the residence.

54. At approximately 12:08 p.m., CS 3 exited the camper. It should be noted that LEE and an unidentified female (hereafter referred to as UFM2) exited the camper and entered CS 3's vehicle and departed. While under constant surveillance, CS 3, LEE, and UFM2, travelled to a Family Dollar, Gas Station, and Checkers located near the intersection of N. 35th Street and W. Burleigh Street, Milwaukee, Wisconsin.

55. At approximately 12:40 p.m., CS 3, LEE, and UFM2 arrived at the residence located at 2614 W. Burleigh Street, Milwaukee, Wisconsin, and parked in the rear of the residence. Shortly thereafter, CS 3, LEE, and UFM2 exited the vehicle and entered the residence through the rear door.

56. At approximately 1:45 p.m., MPD PO Hermann, who was conducting surveillance at the Good Fellas Barber Shop at 4419 W. Center Street, reported that Pierre SMITH had arrived in a dark vehicle and exited with a large duffle bag that appeared to be heavy. PO Hermann reports seeing SMITH enter the passenger side of a black Maserati with the duffle bag. The Maserati then left the area. At approximately 1:52 p.m., the same black Maserati bearing WI Registration BAV3170 arrived and parked in the front of the 2614 W. Burleigh Street address. Subsequently LEE and CS 3 exited the residence, and LEE entered the rear seat of the Maserati. It should be noted that the CS 3 re-entered the residence.

57. At approximately 1:58 p.m., LEE exited the Maserati and entered the 2614 W. Burleigh residence, subsequently the Maserati departed the area.

58. At approximately 2:35 p.m., CS 3 and LEE exited the residence, and entered CS 3's vehicle, and departed the area. CS 3 and LEE subsequently arrived at the 320 N. 32nd Street address, exited the vehicle, and entered the camper located at the rear of the residence.

59. At approximately 4:35 p.m., CS 3 and LEE exited the camper, entered CS 3's vehicle, and departed the area. Subsequently, CS 3 and LEE arrived on South 20th Street near W. National Street in Milwaukee, Wisconsin.

60. At approximately 4:51 p.m., the Honda Odyssey bearing WI Registration BCD5755 (subject vehicle) arrived on South 20th Street and parked near CS 3 and CS 3's vehicle. LEE exited CS 3's vehicle and entered the Odyssey, then returned to CS 3's vehicle. It should be noted that by this time, the recording equipment provided to CS 3 was no longer recording and the remainder of CS 3's interactions with LEE were not recorded.

61. On December 4, 2025, the Honorable William E. Duffin, Magistrate Judge for the Eastern District of Wisconsin, authorized the installation and monitoring of a Global Positioning System (GPS) tracking device on the Honda Odyssey (subject vehicle). The device was installed shortly thereafter and case agents have monitored the subject vehicle's location since that time.

62. TFO Gregory reviewed GPS data for the subject vehicle. Through investigation, case agents know that GONZALEZ lives at 738 South 23rd Street. Case agents conducted physical surveillance of this residence from approximately 10:30AM to 3:30PM on December 9, 2025. Case agents observed the Subject Vehicle parked on the back parking slab for 738 South 23rd Street. The Subject Vehicle did not move from the location during the entirety of the surveillance episode. From reviewing the GPS data, the Subject Vehicle left 738 South 23rd Street at approximately 4:50PM. The Subject Vehicle drove directly to the 700 -block of South 20th Street. The Subject Vehicle was there for approximately four minutes and then returned to the area of 738 South 23rd Street. At approximately 5:01PM, the Subject Vehicle left the area of 738 South 23rd Street. The Subject Vehicle drove directly to the parking lot attached to 612 South 5th Street. This address is a restaurant named Catrina Café. The Subject Vehicle left shortly after and returned to the back parking slab for 738 South 23rd Street.

63. Based on my training and experience, the GPS data for the Subject Vehicle, and case agents' observations of the timing of the Subject Vehicle's arrival at CS 3's location, I believe that GONZALEZ departed his residence (738 S. 23rd Street) in the Subject Vehicle and met with LEE in the area of South 20th Street to supply LEE with methamphetamine for CS 3.

64. At approximately 4:58 p.m., CS 3 and LEE arrived back at the 320 N. 32nd Street residence. Shortly thereafter, LEE exited the vehicle, and CS 3 departed the area and drove to a

pre-determined meet location. It should be noted that CS 3 was under constant surveillance as CS 3 departed the residence and met with case agents at a predetermined meet location.

65. At approximately 5:15 p.m., while at the predetermined meet location, TFO Kopatich retrieved the controlled substances from CS 3. Subsequently, SA Kazamias retrieved the live feed audio/video recording device from CS 3. CS 3 was searched for contraband with negative results. Additionally, TFO Ronsman searched CS 3's vehicle for money, contraband, and controlled substances, with negative results. When searched for money, CS 3 had $68.00 USC OAF remaining at the conclusion of the controlled buy.

66. A post-operational debrief was conducted with CS 3. During the debrief, CS 3 reported that:

a. CS 3 contacted LEE prior to CS 3 arriving in Milwaukee. Prior to CS 3's arrival, LEE had not made contact with any of the drug suppliers. LEE directed CS 3 to 320 N. 32nd Street where LEE was currently staying.

b. Upon CS 3's arrival, CS 3 entered a pop-up camper where LEE and a female known only as Marie, were located. Shortly after arriving, LEE told CS 3 that they need to go back to the house on Burleigh (I believe this to be 2614 W. Burleigh Street) where the "down" (purple fentanyl) would be delivered.

c. CS 3 and LEE were at the residence on Burleigh for approximately 30 minutes before LEE made a call to "Short Bust" (who I believe to Pierre SMITH) and requested two ounces of "down" (purple fentanyl) for CS 3.

d. When "Short Bust" (I believe to be SMITH) eventually arrived, CS 3 and LEE walked down the front stairs towards the front door. CS 3 handed LEE the money for the fentanyl while they were walking downstairs. CS 3 and LEE both exited the front door with the intent of both CS 3 and LEE getting into the vehicle that was parked on the street. CS 3 walked towards the vehicle and noted that the vehicle was full as it now contained LEE, "Short Bust" (I believe to be SMITH), and two other unknown persons. CS 3 went back into the residence. NOTE: The arrival of the black vehicle (Maserati), LEE and CS 3 exiting the front door, and CS 3 going back into residence, is consistent with the observations made by surveillance units on scene as well as video evidence obtained.

e. After CS 3 obtained the fentanyl from LEE, which LEE retrieved from his pants pocket while back in the residence, LEE began unpacking personal belongings that LEE had brought to the residence. A short time later, LEE said that they (meaning LEE and CS 3) would need to go back to the camper on N 32nd Street in order to obtain the requested meth. CS 3, LEE and the female (known to CS 3 only as Marie) got back into CS 3's vehicle and drove back to the camper.

f. While at the camper, another male and female arrived and met with LEE. LEE made a call to someone (according to CS 3 this call was most likely to the person I believe to be SMITH), and ordered another ounce of fentanyl for the male and female. At one point, LEE exited the camper and came back very quickly with the fentanyl.

g. While in the camper, LEE received a message from the "Mexican" (believed by CS 3 to be LEE's meth source) informing LEE that he had a flat tire and that LEE and CS 3 would have to come to him to get the meth. CS 3 and LEE were directed to an area on the south side of Milwaukee where CS 3 and LEE parked on the roadway. Shortly after they arrived, the meth source pulled up behind the vehicle containing CS 3 and LEE. LEE exited and got into the van that the meth source was operating. The van the meth source was driving then pulled in front of the car containing CS 3 and parked. LEE exited the van and got back into CS 3's vehicle with the meth in his coat pocket. LEE subsequently gave the meth to CS 3. CS 3 and LEE drove back to the camper where LEE was dropped off.

67. TFO Kopatich later reviewed the covertly recovered video made by CS 3 during the above-described transactions. Said video generally corroborates the information provided by CS 3 about what occurred during CS 3's purchase of fentanyl and methamphetamine from LEE. Specifically, the video shows LEE and CS 3 walking down the stairs at 2614 W. Burleigh Street when the fentanyl source of supply (believed to be SMITH) arrives. Shortly thereafter, the video shows CS 3 and LEE going outside and LEE walking towards the Maserati, as witnessed by investigators on surveillance. The video then shows CS 3 going back into the residence and, a short time later, meeting with LEE. The video goes on to show LEE and CS 3 getting back into CS 3's vehicle and traveling to 320 N. 32nd Street. Shortly after arriving at 320 N. 32nd Street the audio and video battery failed.

68. Based on my training and experience, the investigation to date, CS 3's statements, and the corroboration of those statement provided by law enforcement surveillance, the GPS data for the subject vehicle, and the covertly recorded video of the December controlled buy, I believe that SMITH likely supplied LEE with fentanyl and that GONZALEZ likely supplied LEE with methamphetamine and that LEE provided both substances to CS 3.

**Brown County Fatal Overdose Investigation**

69. Through investigative deconfliction, case agents learned that LEE is a person of interest in a fatal controlled substance overdose in Brown County, Wisconsin. On October 23, 2025, law enforcement responded to a suspected overdose death of H.R.S. in the Township of New Denmark, Brown County, Wisconsin. Evidence located on scene combined with the prior history of the victim led investigators to believe that the death of H.R.S. was related to an overdose. Dr. Douglas of the Brown County Medical Examiner's Office listed the cause of death for H.R.S. as the toxic effects of fentanyl and methamphetamine.

70. Digital evidence and location data was obtained from multiple cell phone downloads as well as other investigatory techniques. Intelligence was gathered through several witness interviews. The combination of all of the evidence and intelligence that was gathered throughout this investigation shows that on October 22, 2025, J.J.G. and S.J.M. traveled to 320 N. 32nd Street in the City of Milwaukee where they obtained an unknown of amount of fentanyl that was purple in color from LEE AKA "Luffy." J.J.G. and S.J.M. then returned to Brown County with that fentanyl. Upon returning to Brown County they met with the victim, H.R.S. J.J.G. and S.J.M. distributed the fentanyl to the victim, H.R.S., who ingested that fentanyl, causing their death.

**Arrest of Kue LEE**

71. Case agents conducted a wanted check of LEE and found that he was currently wanted by the Wisconsin Department of Corrections for violating the terms and conditions of his extended supervision regarding Sheboygan County case# 2017CF000049 (Possession of methamphetamine) and Outagamie County case# 2021CF001259 (Burglary).

72. On December 11, 2025, members of law enforcement went to 320 North 32nd Street in an attempt to locate and arrest LEE. Officers knocked on the door for the residence and were allowed in to search for LEE. LEE was observed in the living room and taken into custody.

73. Officers conducted a search incident to arrest of LEE. Located in LEE's left pant pocket was a blue Samsung touchscreen smart phone. In LEE's front right pant pocket was a clear plastic bag that contained a purple powder that was suspected to be fentanyl. LEE was transported to the Milwaukee Secure Detention Facility for processing. TFO Kopatich later subjected the suspected controlled substance to a presumptive field test that tests for the presence of fentanyl. The sample tested positive for the presence of fentanyl and had a total weight of 1.4 grams.

**December 2025 Interview with CS 2**

74. In December 2025, case agents conducted a follow up debrief of CS 2. CS 2 stated that GONZALEZ still utilized 414-807-0753 (Target Cell Phone 1). CS 2 stated that GONZALEZ had been utilizing 262-900-2014 (a prior phone number that CS 2 knew GONZALEZ to have used before and during CS 2's present period of incarceration and herein referred to as "Prior Phone 1") for controlled substance transactions. CS 2 reported that CS 2 has personally spoken with GONZALEZ at Prior Phone 1 in the past. However, CS 2 stated that GONZALEZ no longer utilizes Prior Phone 1 and now utilizes a phone with phone number 414-294-9815 ("Target Cell Phone 2"). CS 2 obtained this information from an associate of CS 2 who, in turn, told CS 2 that they got the information from third party known by CS 2 to be acquainted with GONZALEZ. CS

2 does not have personal knowledge of GONZALEZ's use of Target Cell Phone 2 and has never contacted GONZALEZ at that number.

75. In December 2025, your affiant reviewed subscriber information for Target Cell Phone 2. Subscriber results from Verizon listed an unknown subscriber.

76. During the in-person interview of CS 2 in December 2025, I showed CS 2 a WI DOT photograph of LEE. Without hesitation or prompting, CS 2 positively identified LEE as "Fire Boy," one of the individuals to whom CS 2 would sell methamphetamine that CS 2 obtained from GONZALEZ.

**Toll Analysis Between Prior Phone 1 and Target Cell Phone 2**

77. TFO GREGORY found that the phone carrier for both Prior Phone 1 and Target Cell Phone 2 is Verizon. TFO GREGORY served a subpoena upon Verizon to receive call detail records for each cell phone. Through analysis, TFO GREGORY found similarities in the call data for each phone.

78. An analysis of telephone records for Target Cell Phone 2 from November 13, 2025 to December 14, 2025, revealed that Target Cell Phone 2 was in contact with a total of 33 unique phone numbers. Out of those 33 unique phone numbers, 6 phones numbers (18%) also were in contact with Prior Phone 1. The analysis also showed a total number of 448 calls and text messages over Target Cell Phone 2 during the time period analyzed. Out of those 448 calls and text messages over Target Cell Phone 2, 67 calls and text messages (14%) were with phones that were also in contact with Prior Phone 1.

79. Investigators note that Target Cell Phone 2 had 293 contacts with 414-398-5706 which has been identified as belonging to Kue LEE through CS 3 and the controlled

transactions. This amount of contacts accounts for 65.4% of all calls for Target Cell Phone 2 during the time period analyzed. 414-398-5706 was not in contact with Prior Phone 1.

80. When investigators conducted a secondary analysis of the telephone records for Target Cell Phone 2 from November 13, 2025 through December 14, 2025 with numbers *other* than 414-398-5706 (believed to be LEE), said analysis showed a total number of 155 calls and text messages over Target Cell Phone 2. Out of those 155 calls/messages, 67 calls and text messages (43%) were with phones that were also in contact with Prior Phone 1.

81. Based on the foregoing, TFO GREGORY believed that GONZALEZ is using Target Cell Phone 2 as a replacement phone for Prior Phone 1. The last known outgoing contact of Prior Phone 1 occurred on November 24, 2025. It appears that Target Cell Phone 2 began being used on or about November 13, 2025.

82. Through CS 3's information, case agents learned that LEE's phone number is 414-398-5706. TFO GREGORY found the cell phone carrier for 414-398-5706 is AT&T. TFO GREGORY served AT&T a subpoena to receive call data records (CDR). Upon the receipt of those records, TFO GREGORY analyzed the data centered around the dates of the aforementioned controlled buys: November 11, 2025 and December 9, 2025.

83. From reviewing call data from November 19, 2025, LEE's device received a call from Target Cell Phone 2 at 5:38PM and 5:39PM. From reviewing the reports surrounding the controlled purchase on November 19, 2025, case agents observed GONZALEZ's Honda Odyssey arrive in the area of North 31st Street and West St. Paul Avenue at approximately 5:40PM. Based upon the timing of the calls from Target Cell Phone 2 to LEE's device and the arrival of the Honda

Odyssey, TFO GREGORY believe that GONZALEZ used Target Cell Phone 2 and contacted LEE to advise LEE that GONZALEZ was arriving to supply the methamphetamine.

84. From reviewing call data from December 9, 2025, TFO GREGORY learned that LEE's device and Target Telephone 2 were in contact five different times that day. At 4:24PM and 4:29PM, LEE's device called Target Telephone 2. From reviewing the reports surrounding the controlled purchase on December 9, 2025, case agents observed LEE and CS 3 leave the area of North 31st Street and West St. Paul Avenue at approximately 4:35PM. They then immediately traveled to the area of South 20th Street and West National Avenue. Case agents then observed the Honda Odyssey arrive at the location and observed LEE enter the vehicle. Based on the timing of the phone calls and case agents observing LEE and CS 3 leave to meet with the Honda Odyssey, TFO GREGORY believe that GONZALEZ used Target Cell Phone 2 to speak with LEE to advise LEE where to meet GONZALEZ for GONZALEZ to supply the methamphetamine.

85. The data reviewed from LEE's cell phone is from October 30, 2025 to December 15, 2025. Between those dates, there were 465 contacts between LEE's device and Target Cell Phone 2. As previously stated, LEE was arrested on December 11, 2025. On December 14, 2025 and December 15, 2025, Target Cell Phone 2 called LEE's device seven times. Based on this data, TFO GREGORY believe that GONZALEZ did not yet know that LEE was in custody.

86. TFO GREGORY reviewed further call detail records for Target Cell Phone 2 and TFO GREGORY located two known associates of GONZALEZ in contact with Target Cell Phone 2. These associates are Frank MITCHEM and Krizia DAVILA-LOPEZ.

87. As previously detailed in this affidavit, MITCHEM is involved with the warehouse located at 3002 West Burleigh Street. Target Cell Phone 2 was in contact with MITCHEM (262-353-0301) on 8 different occasions.

88. During the investigation, TFO GREGORY served subpoenas upon Wisconsin Energies to receive utility holder information. TFO GREGORY specifically asked for utility accounts that are under "Rehab Better Homes LLC" the LLC for which GONZALEZ is listed as a registered agent. TFO GREGORY found that there are two addresses with the utility holder being "Rehab Better Homes LLC". GONZALEZ is listed as the owner on the utility information and DAVILA-LOPEZ is listed as the "secretary." Target Cell Phone 2 was in contact with DAVILA-LOPEZ (262-751-2323) on 2 different occasions.

**Surveillance conducted on Miguel GONZALEZ on January 6, 2026**

89. On Tuesday, January 6, 2026, TFO Robert GREGORY, TFO Joseph ESQUEDA, and WI State Trooper Gareth SEDGBEER-WILLIAMS conducted surveillance on the residence of 738 S. 23rd Street in Milwaukee, Wisconsin (Target Residence 1). Case agents were aware that this residence was associated with GONZALEZ. During this surveillance, case agents were monitoring the PRTT/ping installed on Target Cell Phone 2, which indicated that Target Cell Phone 2 was in the general vicinity of 738 S. 23rd Street (Target Residence 1). This led case agents to believe that GONZALEZ was at the residence (Target Residence 1). TFO GREGORY, TFO ESQUEDA, and Trooper SEDGBEER-WILLIAMS positioned themselves around 736 S. 23rd St and 738 S. 23rd Street (Target Residence 1) for surveillance purposes. At approximately 12:10pm, a black Jeep Grand Cherokee SUV (the "Jeep") bearing Wisconsin Registration Plate No. BCC-9472 arrived and parked behind the duplex, 736 S. 23rd Street and 738 S. 23rd Street (Target Residence 1). An unknown Hispanic male ("UHM") exited the driver seat of the Jeep and

was allowed inside rear entry door for 736 S 23rd Street and 738 S. 23rd Street (Target Residence 1) via the rear door. At 12:51pm, UHM and GONZALEZ exited the same rear door for 736 S. 23rd Street and 738 S. 23rd Street (Target Residence 1) and walked to the Jeep. UHM entered the driver seat while GONZALEZ entered the front passenger seat. The Jeep then left the area followed by case agents. During the follow of the Jeep, case agents monitored the data provided by the PRTT/ ping installed on Target Cell Phone 2 which revealed that Target Cell Phone 2's approximate location was consistent with the path of travel of the Jeep leading me to conclude that that Target Cell Phone 2 was likely inside the Jeep. Case agents briefly lost sight of the Jeep, but utilizing the data provided by the PRTT, case agents located the Jeep parked in the parking lot for the Wisconsin Department of Motor Vehicle (DMV) located at 2701 S. Chase Avenue. TFO GREGORY entered the DMV and observed UHM and GONZALEZ inside the DMV.

90. Based on surveillance coupled with the data provided by the PRTT/ ping installed on Target Cell Phone 2, I believe that GONZALEZ was in possession of Target Cell Phone 2 when he entered the Jeep at his residence (738 S. 23rd Street/Target Residence 1) and drove to the WI DMV (2701 S. Chase Avenue).

91. On January 12, 2026, the Honorable Nancy JOSEPH, Magistrate Judge for the Eastern District of Wisconsin, approved the search warrant to retrieve the data from the iCloud account assigned to Target Cell Phone 2 / TARGET ACCOUNT. Case agents have not yet received the results from Apple.

**Mitsubishi Outlander Identified**

92. On Tuesday, December 16, 2025, TFO Robert GREGORY conducted surveillance at the duplex, 736 S. 23rd Street and 738 S. 23rd Street (Target Residence 1). While at this location,

TFO GREGORY observed a white Mitsubishi Outlander SUV with black & silver grid-style roof rack and an attached cargo carrier parked behind the location (Target Residence 1). Case agents are aware Miguel GONZALEZ has previously titled vehicles under his business identified as "Rehab Better Home LLC." Case agents conducted an open search of the Wisconsin Department of Transportation (WI DOT) for all the vehicles titled under "Rehab Better Home LLC" and discovered a white Mitsubishi Outlander SUV was assigned to Wisconsin Registration Temporary Plate No. E7717EE and a Wisconsin Registration Plate No. BCL-9975.

93. Case agents obtained sale documentation for the white Mitsubishi Outlander SUV. The vehicle was sold to Rehab Better Homes LLC from 24Hr Towing & Recovery Inc. The phone number listed for Rehab Better Homes LLC was 414-807-0753, which case agents were aware was utilized by GONZALEZ. Within the same documents, case agents located the "Vehicle Transfer and Odometer Mileage Statement." The printed and signed name for the purchaser was "Miguel Gonzalez".

94. Case agents conducted a nationwide Automated License Plate Reader (ALPR) check of Wisconsin Registration Plate No. E7717EE and discovered the vehicle was spotted on December 11, 2025 at approximately 9:55am CST traveling westbound on Interstate (I) 80 through Aurora, Nebraska. The vehicle was again spotted on ALPR on December 11, 2025 at approximately 11:56am, on traveling westbound on I-80 through Gothenburg, Nebraska. On both occasions on this date, the vehicle was spotted carrying a black grid-style roof rack. The vehicle was next spotted on ALPR on December 15, 2025 at approximately 12:10pm CST, traveling northbound on I-90 in Rockford, Illinois. On this occasion, the vehicle had a black & silver luggage carrier attached to the roof rack, which is the same container TFO GREOGRY observed on December 16, 2025.

95. From case agents' knowledge of the investigation, case agents know that GONZALEZ is involved in trafficking of controlled substances. Based on a previous seizure of illicit drugs and debriefs, case agents know that these controlled substances are obtained from California. Case agents also know that drug traffickers use a multitude of methods to transport controlled substances from source states (such as California) to their final destination. These methods include: delivery through the mail, flown on an airplane, and transported on a train or motor vehicle. Based on this knowledge, and the knowledge of the investigation, case agents believe that the Mitsubishi Outlander's December 2025 trip is consistent with obtaining controlled substances from California and transporting them to Milwaukee. Case agents were aware this was the second time that a vehicle registered to Rehab Better Home LLC was spotted on ALPR driving across the United States.

96. The affiant reviewed data provided the PRTT/ping installed on Target Cell Phone 2, which showed the cellular device left Milwaukee on December 10, 2025, at approximately 11:47pm, and traveled to Los Angeles, California arriving on December 12, 2025, at approximately 7:41am. TFO ESQUEDA compared the location data of Target Cell Phone 2 to the ALPR hits mentioned above and discovered that Target Cell Phone 2 and the Mitsubishi Outlander SUV were in the same general location at the same general times on both the trip westbound and the return trip. This led TFO ESQUEDA to believe GONZALEZ was in the Mitsubishi Outlander SUV as it traveled from Milwaukee to Los Angeles and back to Milwaukee. Location data for Target Cell Phone 2 showed that the device began travelled back east towards Milwaukee on December 14, 2025 and the device arrived in the general vicinity of Target Residence 1 on December 15, 2025 at approximately 1:23pm. Location data for Target Telephone

2 showed that the device later hit off a cell tower that covers the general area that includes 2936 W. Wells Street, #204 (Target Residence 2) but the precise device location is unknown.

97. Based on my training and experience, my review of the ALPR data for the Mitsubishi Outlander and phone location data for Target Cell Phone 2, I believe that GONZALEZ travelled to California in the Mitsubishi Outlander to obtain controlled substances on or about December 12, 2025, and then travelled back to Milwaukee with the drugs concealed within the roof storage compartment. I believe that GONZALEZ arrived back in Milwaukee with the drugs on December 15, 2025. The location data for Target Cell Phone 2 showed that the device was in the general area of Target Residence 1 on December 15, 2025 and TFO GREGORY observed the Mitsubishi Outlander parked at Target Residence 1 on December 16, 2025.

**Identified 2936 W. Wells Street, Apartment No. 204 (Target Residence 2)**

98. On December 10, 2025, TFO GREGORY served a subpoena to WE Energies requesting all utility account under Rehab Better Homes LLC. Case agents were aware GONZALEZ was the registered agent of that LLC. On December 11th, 2025, WE Energies responded that Rehab Better Homes LLC was the current utility holder for 2936 W. Wells Street, Apartment No. 204 in the City and County of Milwaukee (Target Residence 2). The phone number listed was 414-807-0753.

99. The affiant reviewed the data for the PRTT/ping installed on Target Cell Phone 2 for the past thirty (30) days. The data showed that Target Cell Phone 2 was in the immediate vicinity of 2936 W. Wells Street (Target Residence 2) on at least twenty (20) occasions with two (2) the occasions extending overnight into the next morning.

**Convert Camera Install / Apartment No. 204 Entry Door**

100. On December 16, 2025, TFO GREGORY, TFO ESQUEDA, and Milwaukee Police Officer Jose MEDINA responded to 2936 W. Wells Street (Target Residence 2) and installed a covert camera in the hallway, outside of Apartment No. 204 with the consent of the property owner. The camera is not constantly recording but rather is motion and heat activated. The camera was installed in a manner to view the entry door of Apartment No. 204 (Target Residence 2) but not the interior of the apartment.

101. When case agents were installing the covert camera, the affiant took note that the doorknob and deadbolt locks to each apartment door in the building were the same color (gray) and design, likely the same brand. This is to have a uniformed look and so the apartment owners and / or management can easily access the apartment through a spare key and / or to easily replace the locks if needed.

102. The affiant took note the deadbolt lock to the entry door to Apartment No. 204 (Target Residence 2) was a different color (black) then the deadbolt locks on the entry doors to the other apartments. This led case agents to believe GONZALEZ changed the deadbolt lock so only he had control of who accessed the apartment and not the apartment owners and/or management team. Based on my training and experience, I believe this is consistent with GONZALEZ using Target Residence 2 as a stash location to store drugs and other contraband—items that he would not want anyone else to have access to and that he would want to have exclusive control over

103. On December 19, 2025, DEA TFO Christopher NAVARETTE and Officer MEDINA retrieved the covert camera to review the recorded videos.

104. Trooper SEDGBEER-WILLIAMS reviewed the recorded videos and found the following to be pertinent to the investigation: on December 18, 2025 at or about 7:53am, the recording device captured GONZALEZ and an unidentified Hispanic male approach the entry door of Apartment No. 204 (Target Residence 2), and GONZALEZ entering the apartment (Target Residence 2). At or about 8:39am, the recording device captured the unidentified Hispanic male standing in the hallway, outside of the apartment and GONZALEZ exiting the apartment (Target Residence 2) and locking the door behind him. At or about 11:10am, GONZALEZ and the unidentified Hispanic male return to Apartment No. 204 (Target Residence 2) carrying items and boxes. GONZALEZ used keys to unlock the entry door before entering the dwelling (Target Residence 2).

105. On December 29, 2025, TFO GREGORY and Trooper SEDGBEER-WILLIAMS were monitoring the PRTT/ping installed on Target Cell Phone 2 and discovered the cellular device was in the vicinity of 2936 W. Wells Street (the building containing Target Residence 2) at 11:00am. Case agents were aware that GONZALEZ was associated to Apartment No. 204 (Target Residence 2).

106. On December 30, 2025, Milwaukee Police Officer Jose MEDINA, TFO GREGORY, and Trooper SEDGBEER-WILLIAMS responded to 2936 W. Wells Street and installed a covert camera in the hallway, outside of Apartment No. 204 (Target Residence 2) with the consent of the property owner. The camera is not constantly recording but rather is motion and heat activated. The camera was installed in a manner to view the entry door of Apartment No. 204 but not the interior of the dwelling.

107. TFO GREGORY then reviewed data provided by the PRTT/ping installed on Target Cell Phone 2 and discovered the location of the cellular device was in the vicinity of 2936

W. Wells Street (the building containing Target Residence 2) which led him to believe that GONZALEZ was inside the apartment (Target Residence 2) at the time of the covert camera was installed. On January 5, 2026, Officer MEDINA, TFO GREGORY, and Trooper SEDGBEER-WILLIAMS retrieved the covert camera to review the recorded videos.

108. TFO GREGORY reviewed the recorded videos and found the following to be pertinent to the investigation: on December 31, 2025, at or about 2:20pm, GONZALEZ exited Apartment No. 204 (Target Residence 2) with an unidentified male, GONZALEZ locked the entry door, and left the apartment building.

**Stash Location**

109. Case agents are aware that entrenched drug traffickers will often compartmentalize their drug trafficking operation in an effort to hinder law enforcement investigations and minimize their exposure during law enforcement intervention. Specifically, case agents are aware entrenched drug trafficker will use separate residences to store the bulk of their drugs and / or money separate the residence that they meet and deal to their drug customers and / or reside. Based on the facts mentioned previously in this affidavit showing that GONZALEZ is an established drug trafficker, the recorded videos of GONZALEZ accessing 2936 W. Wells Street, Apartment No. 204 (Target Residence 2) and the PRTT/ping data from Target Cell Phone 2 demonstrating that GONZALEZ frequents Target Residence 2 during various times throughout the day but rarely staying overnight, I believe that GONZALEZ was maintaining Target Residence 2 as a "stash location."

**January California Trip**

110. On January 6, 2026, case agents conducted nationwide ALPR check Wisconsin Registration Plate No. BCL-9975, which is registered to the white Mitsubishi Outlander SUV as

mentioned previously in this affidavit. The following results were found pertinent to the investigation:

a. January 4, 2026 at 6:27am CST, the vehicle was traveling westbound on I-80 through Omaha, Nebraska.

b. January 4, 2026 at 6:44am CST the vehicle was located traveling westbound in I-80 through Gretna, Nebraska.

c. January 4, 2026 at 7:13am CST, the vehicle was traveling westbound on I-80 through Lincoln, Nebraska.

d. January 4, 2026 at 8:05am CST, the vehicle was traveling westbound on I-80 through Aurora, Nebraska.

e. January 4, 2026, at 9:53am CST, the vehicle was traveling westbound on I-80 through Gothenburg, Nebraska.

f. January 4, 2026 at 4:30pm CST, the vehicle was traveling westbound on I-70 through Debque, Colorado.

g. January 4, 2026 at 5:10pm CST, the vehicle was traveling westbound on I-70 through Loma, Colorado.

h. January 4, 2026 at 11:23pm CST, the vehicle was traveling southbound on I-15 near Craig Road exit in Las Vegas, Nevada.

i. January 4, 2026 at 11:52pm CST, the vehicle was traveling southbound on I-15 near the Town of Jean, Nevada

j. January 5, 2026 at 3:21pm CST, the vehicle was traveling westbound through el Segundo Blvd and Isis Ave in Hawthrone, California.

111. Based on the investigation mentioned previously in this affidavit, case agents believe this trip was consistent with the trip in December 2025 and involved the Mitsubishi Outlander travelling to California to obtain controlled substances to deliver to GONZALEZ. It should be noted that location data for Target Cell Phone 2 showed that the device remained in the Milwaukee area during the above times and, therefore, case agents did not believe that GONZALEZ personally made the trip to California.

**Traffic Stop**

112. On January 12, 2026, law enforcement officers were made aware through nationwide ALPR that the Mitsubishi Outlander SUV was traveling eastbound on I-80 through Lancaster County, Nebraska. Based on my training and experience, and the overall investigation, I believed that the Mitsubishi Outlander had obtained controlled substances in California and was enroute back to Milwaukee.

113. Case agents were made aware that on January 12, 2026, at approximately 2:25pm, Lancaster County Sheriff Deputy NEEDHAM conducted a traffic stop of the white Mitsubishi Outlander SUV between Mile Marker (MM) 405 – 408 on I-80 Eastbound for multiple traffic violations. The driver was identified by his WI driver's license as Francisco CRESPO-TRINIDAD. During the traffic stop, law enforcement officers could smell the odor of marijuana emanating from the interior of the vehicle. Furthermore, CRESPO-TRINIDAD gave an inconsistent story concerning his travel plans. Law enforcement officers conducted a probable search of the vehicle and located 6.10 gram of marijuana in the glovebox and 19.80 pounds of cocaine in the roof rack cargo container. During the investigation, CRESPO-TRINIDAD identified his phone number as 414-208-8701.

114. Case agents reviewed the data provided by the PRTT installed on Target Cell Phone 2 and discovered CRESPO-TRINIDAD's phone number contacted Target Cell Phone 2 at 2:24pm on January 12, 2026, with a call duration of 21 seconds. This led case agents to believe CRESPO-TRINIDAD contacted GONZALEZ to advise GONZALEZ that CRESPO-TRINIDAD was being pulled over by law enforcement. Case agents are aware this is a common tactic for drug couriers (such as CRESPO-TRINIDAD) to inform their co-conspirator (such as GONZALEZ) of law enforcement intervention.

115. Furthermore, the PRTT and ping for Target Cell Phone 2 revealed the following pertinent information:

a. 2:16pm Target Cell Phone 2 was within the vicinity of 738 S. 23rd Street (Target Residence 1);

b. 2:24pm, CRESPO-TRINIDAD contacted Target Cell Phone 2

c. 2:31pm, Target Cell Phone 2 was within the vicinity of 738 S. 23rd Street (Target Residence 1);

d. 2:46pm, Target Cell Phone 2 was within the vicinity of S. 27th Street and W. National Avenue.

e. 3:02pm, Target Cell Phone 2 was within the vicinity of 2936 W. Wells Street (the building containing Target Residence 2)

f. 3:15pm, Target Cell Phone 2 was within the vicinity of I-94 at W. National Avenue, where it remained

g. 4:00pm, Target Cell Phone 2 was within the vicinity of 738 S. 23rd Street, his residence (Target Residence 1).

116. Based on the totality of the investigation, and my training and experience, I believe CRESPO-TRINIDAD was driving to California to pick up the six kilograms of cocaine on behalf of GONZALEZ. I believe that when CRESPO-TRINIDAD was being stopped by law enforcement, he contacted GONZALEZ to alert him of the stop. I believe that GONZALEZ then departed from Target Residence 1, travelled to Target Residence 2, and eventually returned to Target Residence 1.

117. TFO GREGORY spoke to the law enforcement officers involved in the traffic stop of the Mitsubishi Outlander and the arrest of CRESPO-TRINIDAD. The law enforcement officers stated during the traffic stop, they took note that the cellular device recovered from CRESPO-TRINIDAD was receiving multiple WhatsApp phone calls from Target Cell Phone 2.

I believe that these calls were made by GONZALEZ in response to the phone call CRESPO-TRINIDAD made to GONZALEZ at 2:24pm to alert him (GONZALEZ) of traffic stop.

118. TFO GREGORY and TFO ESQUEDA reviewed a booking photograph of CRESPO-TRINIDAD that was captured on January 12, 2026 and positively identified him as UHM in the surveillance episode conducted on January 6, 2026 and mentioned previously in this affidavit. Specifically, that CRESPO-TRINIDAD was the male who accompanied GONZALEZ from the area of Target Residence 1 and travelled to the DMV. I believe this further demonstrates the connection between CRESPO-TRINIDAD and GONZALEZ.

**Arrest of GONZALEZ**

119. Case agents were aware GONZALEZ had a felony warrant for his arrest with the Department of Community Corrections (DOCC). I was aware on January 13, 2026, law enforcement officers assigned to the Fugitive Task Force (FTF) and HIDTA responded to 738 S. 23rd Street (Target Residence 1) to locate and arrest GONZALEZ. Once at the location, FTF knocked on the rear exterior entry door of Target Residence 1 and made multiple announcements identifying themselves as law enforcement and that GONZALEZ had a warrant for his arrest and to show himself. After not getting a response, FTF breached the rear exterior door, which led into the common hallway for Target Residence 1 (Lower Unit) and 736 S. 23rd Street (Upper Unit). FTF knocked on the interior rear door for Target Residence 1 and made multiple announcements identifying themselves as law enforcement and that GONZALEZ had a warrant for his arrest and to show himself. After not receiving an answer, FTF began to breach the interior rear door of Target Residence 1. As this occurred, GONZALEZ tried to evade FTF by fleeing out the front entry door to Target Residence 1. Law enforcement officers assigned to

containment observed GONZALEZ exiting the front entry door of Target Residence 1 and took him into custody.

120. A search of GONZALEZ following his arrest revealed that he was in possession of a black Apple iPhone (with no case) with a sticker on the back with a handwritten note, "414)293-7395" (Device C) and a large quantity of US currency. Law enforcement officers took custody of Device C and the US currency.

121. TFO ESQUEDA drafted residential search warrants for 738 S. 23rd Street (Target Residence 1) and 2936 W. Wells Street (Target Residence 2). The Honorable Nancy JOSEPH, Magistrate Judge for the Eastern District of Wisconsin, approved the residential search warrants for Target Residence 1 and 2 on January 13, 2026, and they were executed that same day.

**Search Warrant Execution at 738 S. 23rd Street (Target Residence 1)**

122. I am aware that law enforcement officers executed a residential search warrant at 738 S. 23rd Street (Target Residence 1) on January 13, 2026, and located the following items of evidentiary value:

a. Black Apple iPhone with a blue & black protective case (Device A) was located in the hallway closet by the front entry door. It should be noted that GONZALEZ would have to walk through this area to access and exit the front entry door. USPIS Special Agent Tyler FINK called Target Cell Phone 2 (phone no. 414-294-9815). The black Apple iPhone (Device A) rang, which confirmed that Device A was Target Cell Phone 2;

b. Black Apple iPhone with a red protective case (Device B) was located in the master bedroom on top of the nightstand, next to the bed. It should be noted, Special Agent Tyler FINK and Trooper SEDGBEER-WILLIAMS interviewed GONZALEZ' live-in girlfriend, Anatalia RODRIGUEZ (XX/XX/1989), who showed up on scene to take custody of the children that were inside the residence. Anatalia RODRIGUEZ stated she lived at the residence with GONZALEZ and identified their bedroom as the master bedroom and further he stated there

regularly. Based on the facts mentioned previously in this affidavit coupled with the fact GONZALEZ sleeps and has control in this bedroom, case agents believed that this cellular device belonged to GONZALEZ and /or he had access to use the cellular device. Preliminary extraction of this device pursuant to federal court order revealed that the device appears to be primarily used by a child.

c. Black Springfield XD-40, semi-automatic handgun having serial no. XD500802 was located in the kitchen on the top shelf of the closet. I am aware from my review of GONZALEZ's criminal history that GONZALEZ is a convicted felon having been convicted in Milwaukee County case 22CF1314 of Fleeing/Eluding an Officer and 2nd Degree Recklessly Endangering Safety and Milwaukee County case 17CF411 of Possessing a Firearm as an Adjudicated Delinquent. By function of these convictions, I believe that GONZALEZ is prohibited from possessing firearms. Further, based on my training and experience, I know that drug traffickers often arm themselves with firearms in order to protect their illegal drugs and/or their drug proceeds. Based upon my training and experience, my knowledge of this investigation and the evidence recovered within Target Residence 1, I believe that GONZALEZ possessed this firearm in furtherance of his drug trafficking;

d. A money counter was located in the living on the bottom shelf of the entertainment center. Based on my training and experience, I know that drug trafficking generates a large amount of cash and that larger scale drug traffickers often possess money counters to assist in counting their illegal drug proceeds;

e. Digital gram scale with glass top, unfired ammunition, a knotted plastic bag of marijuana (12.83 grams) and a bank band for $2,000 were located in the kitchen inside a bag on top of the wall cabinet above the refrigerator. Based on my training and experience, I know that digital gram scales are commonly used by drug traffickers in repackaging their drugs for resale;

f. Multiple unused commercial zip-top plastic bags were located in the kitchen. Based on my training and experience, I know that drug traffickers commonly use this type of packaging to repackage drugs, namely marijuana, for resale; and

g. An empty handgun magazine and multiple boxes of ammunition were located inside a black Michael Kohr's purse that was in master bedroom on the top shelf of the closet.

**Search Warrant Execution at 2936 W. Wells Street (Target Residence 2)**

123. I am aware that law enforcement officers executed a residential search warrant at 2936 W. Wells Street (Target Residence 2) on January 13, 2026. Law enforcement used keys recovered from the bedroom of 738 S. 23rd Street (Target Residence 1) to unlock the front entry door to 2936 W. Wells Street, Apartment No. 204. During the search, law enforcement officers located the following items of evidentiary value:

a. Black rifle stock was located in the living room on top of the couch;

b. Suspected drug ledger was located in the kitchen on top of the shelf in the closet;

c. A black Glock magazine was recovered from the top shelf of the closet in the bedroom;

d. Marijuana (25 grams) was located in the bedroom on the top shelf of the bedroom;.

e. A box of 5.56 ammunition was located in the bedroom on the top shelf of the bedroom;

f. State of Wisconsin Department of Corrections check listing Miguel GONZALEZ as the payee was located in the bedroom on the top shelf closet; and

g. Two (2) vehicle titles listing the owner as "Rehab Better Homes LLC", American Express document addressed to Miguel GONZALEZ, and an Associated Bank document addressed to Miguel GONZALEZ was located on the in the kitchen cabinet.

**Felony Conviction for GONZALEZ**

124. Case agents were aware Miguel GONZALEZ had multiple felony convictions (see below), which prohibit him from possession and / or constructively possession a firearm:

a. Milwaukee County Circuit Court Case No. 2022CF1314 (Vehicle Operator Flee Elude, a class I felony, Wisconsin Statutes 346.04(3); 2nd Degree Recklessly Endangering Safety, a class G felony, Wisconsin Statutes 941.30(2); and

b. Milwaukee County Circuit Court Case No. 2017CF0411 (Possession of a Firearm by Adjudicated Delinquent of a Felony), a class G felony, Wisconsin Statutes "941.29(1m)(bm).

### Search Warrant Execution for GONZALEZ'S Cellular Devices

125. TFO ESQUEDA drafted a search warrant for cellular devices recovered from GONZALEZ at the time of his arrest and the search warrant execution at 738 S. 23rd Street**.** The Honorable Nancy JOSEPH, Magistrate Judge for the Eastern District of Wisconsin, approved the search warrants for Devices A, B, and C on January 15, 2026.

126. TFO ESQUEDA turned over Devices A, B, and C to the Milwaukee Police Department's High Tech Unit (HTU) for forensic analysis. HTU was able to extract the data from Devices A, B, and C and place this data on a media device for review by investigators.

127. Preliminary review of the data from Devices A, B, and C revealed that these devices did not bear the telephone number for Target Cell Phone 1 (414-807-0753). On January 22, 2026, the Honorable Nancy Joseph signed an order to assist in locating the device associated with Target Cell Phone 1. That effort is presently underway, but to date, the device has not yet been seized by law enforcement.

## REVIEW OF GONZALEZ'S TEXT MESSAGES AND THE IDENTIFICATION OF TARGET CELL PHONE 3

### Identification of Michael TERRY as User of Target Cell Phone 3

128. Case agents conducted a search of CashApp for **Target Cell Phone 3**. Case agents found the user to have the name "Michael Terry $mterry0608". Case agents conducted a search of law enforcement databases for "Michael Terry" and case agents located Michael Anthony TERRY (MALE XX/XX/1989). Case agents found a listed moniker for TERRY as "Cadillac Mike." This moniker coincides with the contact name in GONZALEZ's phone for **Target Cell Phone 3** which was "Caddy". I have used these same law enforcement databases in the past and found them to be accurate and reliable for associating people with telephone numbers. TERRY is

presently on active community supervision with the Wisconsin Department of Corrections (WIDOC) as detailed below. I also reviewed records from WIDOC and observed that TERRY's current telephone number listed with WIDOC is **Target Cell Phone 3**.

129. A check of the Wisconsin Court Record System revealed that TERRY has the following felony convictions in Milwaukee County:(a) 2008CF001533 (Possession with the intent to deliver marijuana 1,000 to 2,500 grams); (b) 2008CF003620 (Possession with the intent to deliver marijuana under 200 grams and felony bail jumping); (c) 2012CF000843 (Possession of marijuana second and subsequent offense); (d) 2017CF004318 (Possession of marijuana second and subsequent offense); and (e) 2022CF001921 (Possession of marijuana with the intent to deliver over 10,000 grams, possession of cocaine with the intent to deliver 15-40 grams, and felon in possession of a firearm). TERRY is currently being supervised by the Wisconsin Department of Corrections regarding the 2022 convictions (2022CF001921).

**Review of Cell Phone Data**

130. On January 16, 2026, Cellebrite extractions of the recovered cell phones (Devices A, B, and C) were conducted. The following information is not a full accounting of all of the data recovered from these devices. Rather, I provide the following information to show that phones utilized by GONZALEZ were used for drug trafficking and, specifically, were used to communicate with **Target Cell Phone 3** for that purpose.

131. While conducting a review of the extraction data for the Black Apple iPhone with a blue and black protective case (Device A and found to bear phone number 414-294-9815), Trooper Sedgbeer-Williams observed the following messages between a contact in the phone listed as "CADDY" (414-807-3988— **Target Cell Phone 3**) and Device A. The user of this cell

phone (414-807-3988— **Target Cell Phone 3**) was identified as Michael TERRY, as detailed above. Below are the relevant conversations located on Device A with **Target Cell Phone 3**:

a. On October 29, 2025:

i. At approximately 10:23PM, Device A received a text message from **Target Cell Phone 3** that read, "Ok cool I'm trying to get 2 for 30 is that possible"

ii. At approximately 10:23PM, Device A (believed to be used by GONZALEZ) responded to the above message with, "Man I got to make something"

iii. At approximately 10:23PM, **Target Cell Phone 3** (believed to be used by TERRY) responded to the above message with "What's the lowest"

iv. At approximately 10:25PM, Device A (believed to be used by GONZALEZ)responded to the above message with "23."

v. At approximately 10:26PM, Device A (believed to be used by GONZALEZ)responded to **Target Cell Phone 3** (believed to be used by TERRY) with "Fuck it 31 if you come for both".

vi. At approximately 10:28PM, **Target Cell Phone 3** (believed to be used by TERRY) responded to Device A (believed to be used by GONZALEZ) with "yeah, that's the plan. That's why I said 2 coo".

vii. At approximately 10:30PM, Device A (believed to be used by GONZALEZ)responded to **Target Cell Phone 3** (believed to be used by TERRY) with "Really don't make shit hate to short myself but I see u double up so I can do it, but next time 16 a pop. Got to get it prices went up all over the us and p.r"

132. I have significant training and experience in conducting drug trafficking investigations ranging from low level street trafficking to complex investigations in which large amounts of controlled substances are sent from source states to Wisconsin. Through my training and experience, I have learned how drugs are trafficked, how controlled substances are sourced,

the price of the bulk controlled substances, the "slang" terms and phrases utilized to talk about controlled substances, and the relationship between the controlled substance source and buyer.

133. Based on this training and experience, and my knowledge of the overall investigation, I believe that the October 29, 2025 conversation detailed above shows that the user of **Target Cell Phone 3** is a large-scale drug customer of GONZALEZ. For example, I know that "P.R." is an abbreviation for Puerto Rico. Based on my training and experience, I know that Puerto Rico is a source area for cocaine, meaning that cocaine is imported into the contiguous United States from Puerto Rico. I have participated in numerous investigations in which large amounts of cocaine was found to be sent from Puerto Rico to the Milwaukee area. Further, based on my training and experience, I know that kilogram quantities of cocaine range anywhere from $13,000 to $17,000 and that the price varies depending on the relationship between the supplier and the buyer and the quality of the cocaine. Based on the user of **Target Cell Phone 3's** inquiry of "2 for 30," I believe that TERRY was requesting to purchase each kilogram of cocaine for $15,000 (i.e., a total of $30,000 for two kilograms). Based on my training and experience, I know that individuals who purchase bulk quantities of cocaine will typically purchase the cocaine at a lower price and then sell the cocaine to their customers for a higher price, thereby profiting from the sale. I believe this is what was meant when the person I believe to be GONZALEZ told the user of **Target Cell Phone 3**, "Man I got to make something". Specifically, based on my training and experience, I believe that GONZALEZ was expressing that he cannot sell the cocaine kilograms for $15,000 per kilogram as he cannot derive a profit at that price point. Further, I believe that GONZALEZ later agreed to a slightly reduced price when he stated, "Fuck it 31 if you come for both". Based on my training and experience, I believe that GONZALEZ agreed to lower the price to $15,500 per kilogram if TERRY purchased two kilograms at one time. Finally,

based on my training and experience, I know that users of cocaine do not purchase kilogram quantities for their own personal use. Rather, the quantities being discussed in the October 29, 2025 conversation are, in my experience, consistent with quantities clearly intended for further distribution to the user of **Target Cell Phone 3**'s own customers.

134. Case agents located another text message string between Device A (believed to be GONZALEZ) and **Target Cell Phone 3** (believed to be TERRY) that I believe to be centered around cocaine trafficking in January of 2026:

a. On January 9, 2026:

i. At approximately 6:26PM, Device A (believed to be GONZALEZ) messaged **Target Cell Phone 3** (believed to be TERRY), "They price check me dawg Im playing chess with em right now trynna figure it out they 2 hours away if I wanna go but really don't."

ii. **Target Cell Phone 3** (believed to be TERRY) immediately responded, "Damn, what's the ticket?"

iii. At approximately 6:28PM, Device A (believed to be GONZALEZ) responded to **Target Cell Phone 3** (believed to be TERRY) with, "They want 16.2 and yeah that ain't worth it for me. Waiting on a response from big dawg Keep you updated"

iv. At approximately 6:29PM, **Target Cell Phone 3** (believed to be TERRY) responded, "Ok yea lmk"

135. As detailed in the October 2025 text message conversation between Device A (believed to be GONZALEZ) and **Target Cell Phone 3** (believed to be TERRY), GONZALEZ told TERRY, "…but next time 16 a pop. Got to get it prices went up all over the us and p.r". I believe that this provides context to the January 9, 2026 conversation above. Specifically, I believe that, months later, GONZALEZ gave TERRY a price quote of close to $16,000 per kilogram of cocaine. I believe that GONZALEZ told TERRY that the price went up another $200 per kilogram of cocaine, to $16,200. Based on my training and experience, I know that prices for

bulk quantities of controlled substances vary based on fluctuating availability in the source country, law enforcement operations/seizures, and shipping costs. Based on my training and experience, I believe that GONZALEZ's source of supply had added expenses to the price per kilogram of cocaine and that this price was too steep for GONZALEZ to pay and still derive a profit ("…They want 16.2 and yeah that ain't worth it for me….") and that GONZALEZ was in contact with a possible alternative supplier ("…big dawg…") and would keep TERRY updated if a better price could be secured ("…Keep you updated…" and "Ok yea lmk").

136. Based on my training and experience, and review of the above messages, I believe that as recently as January 2026, TERRY (using **Target Cell Phone 3**) was seeking kilogram-level quantities of cocaine.

**Call Analytics**

137. TFO GREGORY analyzed call detail records for 414-807-0753 (Target Cell Phone 1) and Target Cell Phone 2. TFO GREGORY found one common contact between these two phone numbers. This phone number is 414-807-3988 (**Target Cell Phone 3**). 414-807-0753 (Target Cell Phone 1) was in contact with **Target Cell Phone 3** on 35 occasions between September 6, 2025 and September 28, 2025. Target Cell Phone 2 had one contact with **Target Cell Phone 3** on November 17, 2025.

138. 138. Case agents found the service provider for **Target Cell Phone 3** to be AT&T. Case agents sent two subpoenas to AT&T for phone call records. The first subpoena was served on January 20, 2026 and covered data from November 20, 2025 to January 19, 2026. The second subpoena was served on January 26, 2026 and covered data from November 26, 2025 to January 25, 2026. These phone records show the amount number of connected phone calls, but

they do not show text message contacts, FaceTime, or any other means of contact means. Said records show that **Target Cell Phone 3** was in contact with 414-294-9815 (Target Cell Phone 2—believed to be GONZALEZ) on 414-294-9815 a total of 3 times between January 7, 2026 and January 12, 2026. Said records also show that **Target Cell Phone 3** was in contact with 414-807-0753 (Target Cell Phone 1—believed to be GONZALEZ) on 414-807-0753 a total of 73 times between November 27, 2025 and January 9, 2026. GONZALEZ was arrested on January 13, 2026 and remains in custody.

139. An analysis was conducted to determine whether the numbers that were in contact with **Target Cell Phone 3** before GONZALEZ's arrest remained in contact with **Target Cell Phone 3** after GONZALEZ's arrest. To that end, **Target Cell Phone 3**'s contacts were analyzed for two timeframes (1) November 20, 2025 to January 13, 2026 (Timeframe 1); and (2) January 14, 2026 to January 25, 2026 (Timeframe 2). I found that 78% of the numbers in contact with **Target Cell Phone 3** during Timeframe 1 were also in contact with **Target Cell Phone 3** during Timeframe 2.

140. Based on my training and experience, I believe this demonstrates that: (1) the user of **Target Cell Phone 3** prior to GONZALEZ's arrest continued to use **Target Cell Phone 3** following GONZALEZ's arrest; (2) **Target Cell Phone 3** continues to be actively used at this time, thereby making it more likely that the data sought by this warrant will aid in identifying stash locations and other evidence of TERRY's drug trafficking; (3) GONZALEZ's arrest did not deter the user of **Target Cell Phone 3** from continued use of the device despite the device previously being used to discuss kilogram-level drug trafficking with GONZALEZ. Based on my training and experience, I know that it is not uncommon once one member of a DTO is arrested for other members to change phone numbers in order to distance themselves from the arrested

DTO member. I also know that it is also not uncommon for other DTO members to retain their devices after another member's arrest because of the inherent value of their device (e.g., it is the number known by their customers or suppliers and they do not want to sever those connections). I believe the call detail analysis above demonstrates that the user of **Target Cell Phone 3** did not discard the device upon GONZALEZ's arrest and, therefore, I believe that this device is of an enduring value to its user to enable the user to communicate with his other drug contacts. On January 26, 2026, I called **Target Cell Phone 3** and found it to still be active as it rang numerous times and later went to voicemail. Through my training and experience, I know that drug traffickers will often have more than one source of supply for the substance that they sell. In my training and experience, I know that drug traffickers will commonly use different sources of supply because of price, quality, and/or availability of the controlled substance. For example, in the text messages above between Device A and **Target Cell Phone 3** from January 2026, the person I believe to be GONZALEZ was quoted a price of $16,200 per kilogram of cocaine from one supplier, and because that price was too high, he reached out to another supplier ("…big dawg…") to inquire as to his price. Therefore, even though GONZALEZ was arrested on January 12, 2026, I believe that TERRY will continue to trafficking controlled substances and will continue to use **Target Cell Phone 3** for that purpose. As such, I believe that receiving phone location data will aide case agents in identifying where TERRY resides, possible stash locations, and possible co-conspirators/sources of supply.

## CONCLUSION

141. I believe that TERRY currently uses **Target Cell Phone 3** related to his drug trafficking. The location data associated with **Target Cell Phone 3** will assist case agents in conducting targeted physical surveillance, identifying package distribution locations, identifying

other DTO-related locations to include “stash houses,” and identifying co-conspirators and their roles.

142. Case agents searched law enforcement databases to confirm that **Target Cell Phone 3** is currently being serviced by AT&T.

143. Case agents are requesting this warrant authorizing the initial collection of data related to **Target Cell Phone 3** for 30 days to further investigate TERRY’s drug trafficking activities, and to identify locations to which TERRY is traveling related to his drug trafficking.

144. Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that TERRY is engaged in the trafficking and distribution of controlled substances and is using **Target Cell Phone 3** while engaged in these crimes. I further submit that probable cause exists to believe that obtaining the location information of **Target Cell Phone 3** will assist case agents in determining TERRY’s customers, co-conspirators, sources of supply, and help to identify stash houses.

145. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as “tower/face information” or “cell tower/sector records.” Cell-site data identifies the “cell towers” (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the “sector” (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even

in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

146. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about **Target Cell Phone 3**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

**E-911 Phase II / GPS Location Data**

147. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.

Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of **Target Cell Phone 3**, including by initiating a signal to determine the location of **Target Cell Phone 3** on the Service Provider's network or with such other reference points as may be reasonably available.

**Subscriber Information**

148. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Target Cell Phone 3's** user or users and may assist in the identification of co-conspirators.

**AUTHORIZATION REQUEST**

149. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

150. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

151. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of **Target Cell Phone 3** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

152. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until on November 24, 2026, consistent with the omnibus order signed by Magistrate Judge Joseph on November 24, 2025, after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phone 3** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

153. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

# <u>ATTACHMENT A</u>

## Property to Be Searched

1. Records and information associated with the cellular device assigned call number **414-807-3988** (referred to herein and in Attachment B as "**Target Cell Phone 3**"), with listed subscriber "No Name," and user Michael A. TERRY, that is in the custody or control of AT&T, (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 5400 Legacy Drive, Plano, Texas, 75024.

2. **Target Cell Phone 3**.

## ATTACHMENT B

**Particular Things to be Seized**

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with **Target Cell Phone 3** for the time period September 1, 2025, to the present:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Target Cell Phone 3** for the time period September 1, 2025, to the present including:

a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as Network Event Location Operating System Information, or NELOS data.

b. Information associated with each communication to and from **Target Cell Phone 3** for a period of **30** days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which **Target Cell Phone 3** will connect at the beginning and end of each communication, as well as Network Event Location Operating System Information, or NELOS data.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with **Target Cell Phone 3**.

c. Information about the location of **Target Cell Phone 3** for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, NELOS data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively

and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of **Target Cell Phone 3** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, involving Michael TERRY.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _________________________________, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by AT&T and my title is _____________________________. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of AT&T. The attached records consist of __________________________.

I further state that:

a. All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T and they were made by AT&T as a regular practice; and

b. Such records were generated by AT&T electronic process or system that produces an accurate result, to wit:

1. The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon in a manner to ensure that they are true duplicates of the original records; and

2. The process or system is regularly verified by AT&T and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

______________________________ ______________________________________________

Date Signature